Apotex USA v. Apotex USA I read the language of the statute. It says the court shall work. I mean, the eBay analysis of human injunctions is predicated on some modicum of discretion by the trial court. And just as Judge Rader mentioned, where's the discretion in 271A4A which says the court shall? Where's the discretion in 271A4A? Well, our point, Your Honor, is that the court should engage in the analysis so that if one of the four factors is an overriding factor, for example, a public interest factor, it could still find that an injunction due to public interest could not... So, in other words, a generic would always get to on the market as long as it was an important health-saving drug, right? Because they would argue public interest, we can't work, it's an infringement, but we're allowed to go on the marketplace because this is important for public safety. Not in every instance, if it were an extreme emergency or something. In any instance, where's the discretion, as Judge Prost was pointing out to you, to even reach that point? Well, Your Honor, we submit that the district court still must engage in the analysis. Because you're an important drug, you can ignore the rights of the party that developed that drug at a cost of billions of dollars. Is that what you're saying? I invent the cure for AIDS. Because I've invented the cure for AIDS, you get to put it on the marketplace as a generic, undercutting my billions of dollars of investment just because it's a cure for AIDS. Is that your argument? No, Your Honor, but if the court... No, no, tell me why that isn't your argument. Your Honor, what we're saying is that the court must have engaged in the analysis. Because if that's procedural, we're talking the law, you and I here, talking with the law, why isn't that a more legal argument? See, that's what you want, right? Yes, Your Honor, if there's an override... Thank you, at least we got to that point. But where in the statute are you given any right to make that argument? The statute does say shall, so it does not explicitly say... Give you the right to make that argument. Yes, Your Honor. So you want the right to go back and argue over the permanent injunction, but assuming hypothetically you were to affirm the district court on the findings with respect to obviousness, it would leave the 271 order in place. So why does it matter whether you get the injunction if you're still left with not being able to get FDA approval on anything? That is certainly a practical aspect of the argument. But you couldn't produce without the FDA approval. No, because in this particular case, it was only tentative approval. There was not any final approval issued by the time of the litigation decision. It was subject to the certification. Yes, Your Honor. So if you don't have the approval, then you can't produce with or without the injunction. Correct. So why would you need the injunction? It was more a matter of showing the district court's failure to properly analyze, as it had done in so many instances in this case. This court has vacated its prior opinions on injunctions no less than three times. And here, it didn't engage in a single analytical point on the injunction at all. But that was still dependent upon the outcome of the obviousness analysis. Yes, Your Honor. So the injunction at that point is probably premature, isn't it, on the part of the court to not have had any kind of an analysis at that point. I think the rationale for the court to dissolve those injunctions was based upon the inability to determine how and why it was issued, because there was no rationality to it. Yes. So why is it not as a rationale, basically, a finding of validity? At least as far as the statute is concerned, it couldn't produce without the approval, with or without the injunction. Period. I don't even know why they need the injunction. That is correct. As Ms. Libby testified at trial, going back to the unexpected results, she testified that it showed in column 4 of the patent any of the many surfactants listed in column 4 of the patent would have been useful in her alleged invention. In addition, the file history showed that any non-ionic surfactant in an ophthalmic, in a stabilizing amount, was within the scope of the invention. That's Exhibit 24, JA104546. These are clear admissions that virtually any water-soluble, non-ionic surfactant is suitable in the claimed invention. This report clearly aired when it held there were no test results at the time of the invention that showed that other surfactants would work equally well compared to Octox 240. You're into your rebuttal, do you want to stop right now? All right. Thanks a lot, Mr. Schilder, and we'll hear from Mr. Franklin. Thank you, Your Honor. Good afternoon. May it please the Court. It goes without saying that Actex has a very heavy burden to prove by clear and convincing evidence that the 493 patent is obvious. We've had two bites at the apple, a three-week trial, and an extensive remand hearing before Judge James, and they haven't come close either time. And I think that the thrust of their arguments and their reasons to some extent here today is to try to deflect our attention away from that fact by taking attacks at Judge James. But, Mr. Bragg, when the remand hearing was issued and the matter went back and the reweighing and the evidence took place, it seems that they came up with the same results as before without too much reweighing of the evidence. Well, I respectfully disagree, Your Honor. I think you wanted to look at the extensive findings of fact and conclusions of law that Judge James went through. He carefully reviewed all of the evidence pursuant to your instructions, and I'm happy to review any of that with you. For example, he went back and went through each piece of prior art, specifically having in mind and deciding the fact that you had instructed him that he should never look at those pieces of art as teaching away. And so he did that extensively. And he went through each piece of prior art that would be the Waterbury, Hahn, and Gilbert references along with McCutcheon and carefully articulated what was missing from those pieces of prior art.  gave his opinion as to after weighing all of the evidence, why none of that art would provide a motivation to combine and why it certainly wouldn't teach the invention of the 493 Path. So I think in that regard, he did that. And I'm happy to discuss any of that art and explain to you why Judge Jenkins reached that conclusion and why it's the right conclusion. He was criticized for not going back and looking at the Syntex Report, or whatever you want to call it, the Lingate Food Report. He did that. He did that very carefully. Now, he weighed that evidence. That's what a trial judge is supposed to do. He's supposed to weigh the evidence. He looked at that report. And the testimony from Food and Lingate was, we don't recall what pharmaceutical we had in mind the time we made that statement in that report. So the status of the record in front of Judge Jenkins as he took a look at that report, pursuant to your instructions, was, yes, Octoxyl-40 may have been used in one or more pharmaceutical applications. We don't know what kind of application. We don't know what Octoxyl-40 was used for, whether it was ever used in an ophthalmic application, whether it was ever used in an ophthalmic application in a safe manner, whether it was ever used to resolve the complexation or incompatibility between a carboxyl group NSAID and a quaternary ammonia preservative. We had none of that. And then he compares that to the testimony of their own witness, Dr. Meeker, who testified, rather uncategorically, that based upon his knowledge, and this was a man of skill in the science who presumably had gone through during this trial and looked very hard to find one, he did not know of any prior use or existing use of Octoxyl-40 in any pharmaceutical other than ambula. Mr. Brainard, I'm going to shift gears on you, too. Sure. Let's go to the... Oh, excuse me. Yeah. My colleague has a question. All right. With respect to the lower court's determination on page 21, which is J.A.E.H., the joint appendix, the lower court speaks to Dr. Meeker's critique of syntaxes relating to testing relating to privileges, also on persuasion. In Dr. Meeker's analysis, at least, there's a statement in the record showing that Dr. Meeker's analysis showed, and my studies also show, however, that several surfactants, including oxanol-30, oxanol-10, as clear to everybody as that oxanol-40 is basically related in all the water-soluble oxanols. Why is that not persuasive? Well, as I think Judge Jenkins properly found, those tests were conducted in the year 2002, and therefore, as a matter of evidence, they're irrelevant to demonstrate what one would have known of ordinary skill in the art of mathematical... He said they were not relevant. He said they were not persuasive. Right, and he also found them to be not credible. That was another point he made as well. In addition to that, he found them not credible in part for that reason. He found them not credible in part because he found that they were scientifically flawed because those tests did not look at and evaluate the variables that existed in this formulation. For example, Mitra's tests only tested one batch of BAC, and there was extensive testimony in the record about BAC having different homologues, and the difference in those homologues would have a dramatic effect upon solubility. In addition to which, he had testimony from Dr. Stella, number one, that Dr. Mitra's entire scientific premise behind those tests was flawed. He had specific testimony, which he said was the 2080 from Dr. Stella. That's exactly the Stella experiments replicated. No, Stella did some work, but this is Stella's testimony looking at Mitra's analysis. Mitra's analysis was based upon a theory about how BAC and Keterola interact and how they fall out of a solution and come back in a solution. I don't know whether the court wants me to go through the entire theory, but what Dr. Stella did is he looked at that theory or that analysis and said it's fatally flawed. The big flaw was because the more Keterola trimethamine you put in the solution, the more Keterola, the more K you put in, which undermines the entire analysis. So he found the analysis to be flawed for that purpose. Fundamentally unsound. Fundamentally unsound. Thank you, Dr. In addition to which, Dr. Stella at JA 2080 specifically testified that non-ionic surfactants have different chemical structures, therefore perform differently, in part because they have different critical micelle concentrations. And Judge Jenkins looked at that. He also looked at the fact, which is, I think, very compelling here, that the Syntex scientists who were testing back in the 82-83 period extensively tested a wide range of surfactants and found that there was a wide diversity in how they performed, and the ultimate resolution there was that octox would perform better than every other one based upon extensive testing. I'm going to shift the gears now. Okay. If you don't mind, Mr. Brainerd, despite my banter with Mr. Silver, it does appear to me that there might be a reason to have an injunction, even after finding that they can't go on the marketplace until the patent expires. They could, with an injunction properly denied, make a stockpile of the drugs that could be available for marketing the very instant that the patent does expire, thus speeding the generic to the marketplace. Why isn't that an appropriate reason, and why doesn't that suggest that there ought to be some consideration of injunctions post a finding of no infringement, of infringement and validity? Well, certainly that's a... Your Honor, you've just come up with a very, I suppose for want of a better word, creative observation. All I can say is that under the construct of the Hans Waxman Act, and you've already gone through this, I don't want to kind of repeat your arguments, but it's clear that Congress has set up a structure here which says if you've got a generic, it's been found to be infringing of a patent, and that patent is valid and not expired, the whole thrust of the Hans Waxman Act is to prevent you from going to market with that. Granted. Right. We've already established that you can go to market. The question is, do you get to further go on to the question of an injunction for the purpose of stockpiling? Certainly it's not contemplated by the Hans Waxman Act, so I would say no. Well, why isn't it? Because the Hans Waxman Act does leave in place the prospect of injunction. Well, because... I may be wrong on this, Your Honor, but I'm just going to throw out the only reason I can think of right now, which is, as Your Honor indicated a little while ago, there's a specific provision in the Hans Waxman Act that says the judge shall issue an order. They're not arguing that it was an artificial infringement case in the first place. But prevents the FDA from granting approval. I don't know whether they can make anything before they get an approval. I don't know the answer. I have to confess I don't know the answer. But if, in fact, that's the case, that would be an adequate reason why, even under an injunction, you shouldn't be allowed to start stockpiling six months ahead of time. Wouldn't you need an injunction at that point, though, if they can't produce any product because they need FDA approval at that point? Well, arguably the injunction under those circumstances would be sort of a belt and suspenders operation because of the clear statutory mandate of E-4A, which is the statutory provision we're talking about here. Clearly. So other than that, Your Honor, I can't give you any further answer to your question. I just think that when you look at this construct as a whole, which clearly says you can't go to market, you can't even get FDA approval under these circumstances, I don't think there would be any real basis coming back in front of a judge under an injunction situation and asking permission to start stockpiling before you get approval from the FDA. Well, wait, so are you saying that if we were to vacate because we just don't know what to do with D-Day, vacate and demand to the district court judge to apply D-Day, that you all would pursue your injunction in any event, if indeed we otherwise left the order, the Hatch-Waxman order in place? Well, I think we would pursue the injunction because I think the injunction is coextensive with the whole thrust of the Hatch-Waxman. Why would you need the injunction? Well, I guess to some extent belt and suspenders, but I mean, to be absolutely sure that there's no wiggle room with these folks as to whether they could go out and do something that would be contrary to the thrust of the statute. So if you're saying you would pursue an injunction, even with this order in place, then why isn't it incumbent upon us to send it back to the trial court to effectively have the factors underneath it? Because I believe, Your Honor, that we're, as I said at the outset, and that's really the primary underlying reason here, is we're not operating under 283, we're operating under the Hatch-Waxman. And the Hatch-Waxman clearly creates this construct where I think we can all agree that Congress's intent was to do exactly what it said it was going to do because Congress, in essence, saw or sensed irreparable harm if the contrary were allowed to happen. But it doesn't speak to irreparable harm. Well, the statute doesn't speak to irreparable harm. My point, Your Honor, is when you look at the statutory construct as a whole, starting with a 30-day stay, I mean a 30-month stay in a lawsuit that would be litigated in the first place, Congress is very, very intent upon preventing anything that could happen to let a generic go to market in a situation where we'd be infringing a valid patent and not yet expired. You could also argue that the Hatch-Waxman has the purpose of at least increasing competition in some of these areas by allowing the generics to extradite their trip to the marketplace except, obviously, under certification of Part IV, which, of course, now we need to be facetious with it. That's where we are. That's the ballpark understanding. We still have operating here. We still have some time left on the patent unless we reverse the district court's decision on this. But at that point, assuming that we affirm, then the issue of whether or not an injunction would be required under the statute is questionable. But obviously, if it is still available, then maybe we should send it back and let the judge decide whether or not under eBay requirements an injunction is required. Well, to the extent there is any question in the court's mind as to whether or not the judge should issue the injunction or whether he did so properly, I would suggest it's harmless error for the reasons we've already talked about. We have other issues in the brief as to whether they could have timely raised this and given Judge Jenkins the opportunity to address these issues before this matter came to the court. Our position is that they could. The opinion came out on the 15th of May. Judge Jenkins didn't even issue his final order in this case and the injunction until the 2nd of June. And the final judgment in this case wasn't entered until the 18th of August. So there was ample opportunity. And I think he should have had the opportunity to confront this initially. There was ample opportunity for them to bring this matter to the attention of the judge in a motion to reconsider or some kind of a letter brief or what have you. And they made no effort to do so. So I think there's a way for you. Well, eBay happened in between. eBay happened after the hearing. No question about it. I think the hearing was in mid. I haven't got that date, but it was in February. And the eBay opinion, in my recollection, came out on the 15th of May. Judge Jenkins issued the findings of fact and the order, which we have in front of us today, including the injunctive relief, on the 2nd of June. But a final judgment in this case was not entered until the 18th of August, is my point. As our court dealt with that, I know we've had a few opinions post-eBay where we've been remanded. We've been dissented back because of eBay. Do you know of any precedent where there was a waiver argument on the timetable and the timing of it? I don't know. My legal team behind me says no, so I'm going to say no to that. That's why you have a team. Thank you. Absolutely. Thank you very much. Chief Silber, you want to comment on my attempt to pull your butt out of a fire? No, Your Honor. I think I'll leave where it's at. I do want to point out that Dr. Stella, their expert, did not perform a single test in this case. Dr. Mitchell performed tests for two years. His tests confirmed what Syntex found and what Novex Pharma found. When the district court found his tests to be flawed because he didn't test different grades of back and different blocks of KT, there's nothing in 493 patent that requires that. And in fact, if you look at column three, it says the ingredients used in the formulations the President mentioned are typically commercially available or can be made by methods readily known to those skilled in the art. Dr. Mitchell tested KT. He tested two other NSAIDs. He tested three of the preservatives, cetramide, CPC, and BAC. Lynn Gate testified she only ever tested BAC, and she only ever tested keterolectromethamine. So Dr. Mitchell's tests far surpassed what anyone at Syntex ever did. And Dr. Mitchell obtained his ingredients from commercial sources, including those from Novex Pharma. And I see at this point I'm out of time. Thank you very much, Mr. Silver. Our next case is PMC Research versus Payment Tech.